

SO ORDERED.

SIGNED this 25th day of May, 2016.



UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **C AND M INVESTMENTS OF HIGH POINT INC., et al.,** | ) ) ) | Case No. 13-10661<br>Chapter 7<br>(Consolidated Cases for Purposes of Administration) |
| Debtors. | ) | |
| | ) | |
| **JOHN A. NORTHEN, Chapter 7 Trustee for C&M Investments of High Point, Inc., C. Wayne McDonald Contractor, Inc., C. Wayne McDonald, and Wendy C. McDonald,** | ) ) ) ) ) ) | |
| Plaintiff, | ) | Adv. Pro. No. 14-02005 |
| v. | ) | |
| **MDC INNOVATIONS, LLC, MDC INVENTIONS, LLC, JASON MCDONALD, and MARK ALLEN HALL,** | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER came before the Court on January 6, 7, and 8, 2016 for trial on (1) the complaint filed by the Chapter 7 Trustee, John A. Northen (the "Trustee"), against MDC

1

Innovations, LLC ("Innovations"), MDC Inventions, LLC ("Inventions"), Jason McDonald ("Jason"), and Mark Allen Hall ("Mark"); and (2) the cross-claim filed by Mark against Wayne McDonald ("Wayne") and Jason.  J.P. Cournoyer appeared on behalf of the Trustee; Peter Juran appeared on behalf of Mark; and Ellis Drew, John Meadows, and Leon Porter appeared on behalf of Innovations, Inventions, and Jason.  At the hearing, the Court received testimony from Mark, Wayne, Jason, Wendy McDonald, Natalie Crenshaw Folmar, Scott Randolph, and Robert Pitts.  After considering the testimony before the Court, the arguments of counsel, the pleadings, and the record in this case, the Court finds the ownership interests of Mark, Wayne, and Jason in the MDC Companies to be 22.5%, 38.75%, and 38.75%, respectively.  The Court further finds that the property at issue constitutes an asset of the MDC Companies and directs Jason to transfer the Patents (as defined below) to the MDC Companies.

## PROCEDURAL BACKGROUND

This proceeding arises out of the involuntary bankruptcies of C and M Investments of High Point, Inc., C. Wayne McDonald Contractor, Inc., C. Wayne McDonald and Wendy McDonald, initiated by petitioning creditors on May 17, 2013.  The complaint seeks: (1) a declaratory judgment determining the ownership rights of Wayne, Jason, and Mark in Innovations and Inventions (collectively, "the MDC Companies"), with an order directing Jason to transfer all intellectual property rights in the Nexcavator and related technologies (the "Intellectual Property") to the MDC Companies; (2) an accounting of the assets held by the MDC Companies; and (3) the avoidance and recovery of a purported transfer of ownership rights in the MDC Companies from Wayne to Jason.  The cross-claim similarly requests that Jason be compelled to transfer the Intellectual Property to the MDC Companies, and demands, in the alternative, damages for fraud and unfair and deceptive trade practices, trebled under North

Carolina General Statutes Chapter 75.  The cross-claim also seeks an award of costs and attorney's fees.

On August 26, 2015, upon consideration of motions for summary judgment submitted by the parties, the Court entered an order declaring Mark to possess no less than a five percent ownership interest in the MDC Companies.  The Court explained that an October 17, 2011 agreement among the parties, which employed Mark as the Executive Vice President and Chief Financial Officer ("Executive V.P./ C.F.O.") of the MDC Companies in exchange for an immediate five percent ownership interest in the companies, was a valid, unambiguous, and enforceable contract.  The Court refrained from making further findings.

The matter again came before the Court for trial on January 6, 2016.  At the conclusion of trial, the Court accepted post-trial briefs from the parties and took the matter under advisement.

## FACTS

Wayne is married to Wendy C. McDonald.  Jason is Wayne's son by a previous marriage. Wayne has been in the real estate business in North Carolina for over forty years. He would buy homes and commercial properties in various conditions and refurbish and restore the properties for rent and resale.  At one time, Wayne had assets in excess of $40,000,000 and debts in excess of $20,000,000.

Wayne was introduced to Mark Hall when Mark served as a loan officer at BB&T.  Mark was familiar with several of Wayne's real estate properties and the loans associated with those properties.  Mark has an MBA degree from Wake Forest University and experience in equipment financing.  Wayne and Mark developed a working business relationship over an extended period of time.

3

Growing up in the McDonald household, Jason expressed an interest in his father's work and became an experienced heavy equipment user. Those who know Jason testified that he lacks people skills and can be off-putting but that, as a result of his upbringing and abilities, he has a gift for working with mechanical devices. In 2006 to 2007, Jason came up with the idea to build an excavator that could more easily create slopes from a fixed position. He envisioned the addition of a bucket compatible with the operation of heavy equipment that could rotate and swivel. Since that time, his primary focus has been on developing a number of working prototypes for this device, known as the Nexcavator.

In July of 2011, Wayne and Jason (the "McDonalds") formed the MDC Companies to develop and market the Nexcavator and related or derivative technologies. Each made an initial capital contribution of $500 and held a fifty percent ownership interest in the MDC Companies until the fall of 2011, when Wayne approached Mark about joining the companies, expressing an interest in recruiting an individual from the corporate world to help grow the business. Mark was shown videos of the partially completed device and agreed to join the companies as Executive V.P./ C.F.O. In exchange for his services, Mark was granted an immediate 5% ownership interest in the companies.[2]

After working full-time for the companies for less than a year, Mark signed an agreement with the McDonalds on May 18, 2012 (the "2012 Agreement"). This agreement provided that in exchange for the temporary foregoing of a salary and a $150,000 investment, Mark would receive an additional 17.5% ownership interest in each of the companies, "including all related intellectual properties". Though not explicitly delineated in the agreement, Wayne and Jason promised that their capital contributions to the companies would be in the form of assignments of

---

[2] Mark also agreed to a reduced, deferred salary.

4

intellectual property rights in the Nexcavator[3] and related technologies[4] (the "Intellectual Property").[5] They also promised Mark "[a]n equal salary, compensation and benefits" as themselves, a limited option to purchase an additional two and a half percent interest for $50,000, and "[a] first right of refusal on any future stock offerings, ownership sales or other capital raises, including a right to a pro-rata portion of such an offering."

Relying on the 2012 Agreement and assurances with respect to the Intellectual Property, Mark began investing in the MDC companies. Most of the monies spent were for the development of a working prototype for a standard (as opposed to "mini") excavator. The Companies generated no sales or revenue.

Mark served as the uncompensated "face" of the MDC Companies until approximately June of 2013. In this capacity, he introduced the companies to the public as the owners of the Intellectual Property.[6] He also made repeated requests for the patent papers and associated documents from the McDonalds. They evaded his requests. Tuggle Duggins PLLC, a law firm retained to complete the MDC formation documents, simultaneously evidenced no hurry to memorialize Mark's ownership interest in the companies.

By March of 2013, Mark had invested nearly $150,000 into the companies, but they needed additional capital for continued operations, *see, e.g.*, Ex.'s 75, 76. After several unsuccessful attempts to secure outside funding, the McDonalds offered Mark an additional 10.83% ownership interest in the companies for an additional $75,000 investment. *See* Ex. 106

---

[3] At this time, the Nexcavator was not yet patented.
[4] These related technologies include future technologies or developments based on the Nexcavator.
[5] These intellectual rights would eventually comprise, at least in part, patents US 8,631,595 B2 and US 8,621,770 B1. *See* Ex. 63; Ex. 64. Although Jason and Wayne testified that they never promised or led Mark to believe that they would transfer any intellectual property rights to the MDC Companies, this testimony contradicted all other evidence before the Court and was clearly false.
[6] For example, he submitted Exhibit 62 to the PDI Call for Technologies Competition and stated therein that MDC Innovations was developing the Nexcavator to manufacture and sell and could "sell a license to manufacture the product." *Id.* at 4. He also prepared non-disclosure agreements between the MDC Companies and Clay Porter, Griffin Gear, and ProTool Company, Inc.

(acknowledging the existence of an offer and attempting to either discredit or clarify it, "Wayne stated that the $75,000 was never taken and the changes to the documents were never made"); Ex. 107 (stating that Mark "will acquire an additional 10.83% Residual Interest pursuant to the terms of that certain Limited Liability Company Interest Purchase Agreement"). The exact terms of this offer (the "2013 Offer") remain unclear. *Compare* Ex. 105 (documenting potential terms of the offer in a Limited Liability Company Interest Purchase Agreement and First Amendment to Operating Agreement drafted by Tuggle Duggins, stating that the $75,000 "shall be *transferred at closing directly* from Purchaser to either the LLC or MDC Inventions, LLC to be used for (A) the operating expenses of the LLC or MDC Inventions, LLC or (B) any remaining amounts in excess of operating expenses to be contributed to either the LLC or MDC Inventions, LLC" (emphasis added)) *with* Mark Hall, Testimony at the United States Bankruptcy Court for the Middle District of North Carolina (Jan. 6, 2016) (stating that the McDonalds offered him a vested right to this increased ownership interest upon completion of investments equivalent to a total infusion of $225,000 into the companies).

On May 13, 2013, Mark paid an invoice from ProTool Company, Inc. in the amount of $38,380, bringing his total investment in the MDC Companies to $175,793.39. *See* Ex. 76 (summarizing Mark's official expenditures). Based on a series of emails between Mark, Jason, Wayne and Tuggle Duggins, Mark believed that the MDC operating and purchase agreements were finally complete and ready for signature. Mark arrived at the office of Tuggle Duggins on May 29, 2013. At the meeting which followed, the McDonalds terminated Mark's employment and stated that he would have no further involvement with the companies.

As of his termination—and indeed, as of the May 17, 2013 involuntary petition date in these consolidated proceedings—Mark held a 22.5% ownership interest in the MDC Companies.[7]

The McDonalds' ownership interests in the companies on or around the same date remain unclear. Wayne and Jason introduced documents[8] at trial which purport to represent a December 30, 2011 transfer of Wayne's interests in the MDC Companies to Jason (the "Transfer Documents").[9] Wayne also testified that he received $5,800 in debt forgiveness from his son in exchange for these transfers. If there were no doubt as to the credibility of the McDonalds on this subject, then Jason would have held a 77.5% ownership interest in the companies as of Mark's termination and the petition date.

It is clear, however, that the Transfer Documents were created in 2013,[10] and it is doubtful that Wayne received any consideration for his interests in the companies.[11] It

---

[7] The parties did not intend language in the 2012 Agreement which stated that all legal stock certificates and/or membership interests would be "legally prepared, issued and concluded . . . before the close of business on June 18, 2012[,]" Ex. 4, to establish a condition precedent to the enforcement of the agreement. Mark's first investment in the companies occurred on May 22, 2012. *See* Ex. 17. After June 18, 2012, Mark continued to invest significant funds in the companies, *see* Ex.76, despite the fact that the parties had not yet finalized any membership documents. By May 13, 2013, Mark had invested over $150,000 into the companies, fulfilling his capital contribution requirement under the 2012 Agreement and securing his 22.5% interest in the companies. *See* Ex. 76 (noting the date Mark paid a February 28, 2013 ProTool Company, Inc. invoice). Whether Mark now holds a vested right to an additional 10.83% interest in the MDC Companies under the 2013 Offer will be addressed in the discussion.

[8] These documents were introduced as Exhibits 10 and 11.

[9] Scott Randolph, a roughly fifteen-year family friend, also testified to witnessing these transfers in 2011. He stated that Wayne and Jason each signed "the form" once to transfer Wayne's ownership interests. He also noted that he remembered it was the end of 2011, because he was trying to discuss a bid with Wayne before the new year. The transfers at issue required two signatures from Wayne and two signatures from Jason, one for each of the MDC Companies, each company represented on separate document. Even if the McDonalds had already signed one of the documents before Mr. Randolph arrived, the assuredness of Mr. Randolph's testimony, over four years after the alleged event at issue, was too convenient for an individual with no involvement in or other knowledge of the MDC Companies, let alone an individual who did not review and was not asked to serve as a witness for the form he believes was signed in his presence. The Court did not find Mr. Randolph's testimony credible. Even Jason could not definitively state that the transfers occurred on December 30, 2011 until after his deposition.

[10] The evidence leads inescapably to this conclusion: (1) The 2011 Transfer Documents describe Wayne's desire to transfer and assign his "entire 38.75% Membership Interest[s]" in the companies to Jason, but as of December 30, 2011, Wayne held a 47.5% interest in the MDC Companies. (2) When asked about this figure, Wayne stated that Jason had informed him he would never part with more than a 22.5% interest in the companies. Under the 2012 Agreement, wherein Mark acquired the right to a 22.5% ownership interest in the companies, Mark was also granted the right to purchase an additional two-and-a-half percent interest in the companies, for a total membership interest

7

nevertheless remains unknown if the Transfer Documents were executed before or after petitioning creditors initiated the involuntary proceedings in this case, as either scenario appears equally likely. Thus, Wayne and Jason may have each held a 38.75% ownership interest in the companies as of the May 17, 2013 petition date, or their interests may have been 0% and 77.5%, respectively.

In addition to their insistence that the Transfer Documents were created in 2011, the McDonalds were less than candid with the Court on other occasions. The two flatly denied that they promised to transfer any intellectual property rights to the companies throughout the three day trial in this matter, despite ample, unambiguous evidence to the contrary; reluctantly

---

of 25%. Mark was later offered another 10.83% ownership interest in the companies. (3) The 2012 Agreement refers to Wayne as a "member" and "leader[] of a new venture." It does not mention the 2011 transfers. (4) Neither Wayne nor Jason informed Mark about the assignments. They did not provide him with copies of the 2011 Transfer Documents. The first time Mark heard about the transfers was during the discovery phase of litigation. (5) Wayne emphatically stated that he executed the 2011 Transfer Documents, because he wanted Jason to have "what was his." To execute this desire, the documents should not have taken into account a decrease in ownership interest which had yet to occur. (6) Wayne stated that he transferred his ownership interests in exchange for $5,800 in debt forgiveness. This consideration was not mentioned in the 2011 Transfer Documents. Ten days after allegedly receiving this "forgiveness", on January 9, 2012, Wayne paid a December 13, 2011 invoice for the MDC Companies in the amount of $11,189.54. *See* Ex. 71. (7) Attorneys at Tuggle Duggins, including those working on other property transfers for Wanye, did not know about the 2011 Transfer Documents. (Thus, for example, a January 2013 draft of the MDC Innovations, LLC operating agreement noted Wayne's 38.75% interest in the company. *See* Ex. 107.) (8) Ms. Folmar, an attorney who worked on the operating/purchase agreements for the MDC Companies, stated that she believed she first learned of the transfers on May 29, 2013. (9) Mr. Anderson, an attorney with Tuggle Duggins, sent Wayne an email on April 25, 2013, stating that the firm had edited the MDC Companies' operating and purchase agreements per their discussion with him "a few weeks ago." Ex. 116. They added a section to the operating agreements allowing Wayne and Jason "to transfer [their] interests within [the] family without giving Mark first refusal rights . . . ." *Id.* They also noted Wayne's ownership interests in the companies as 38.75%, in keeping with the 2012 Agreement. *Id.* at TD905, TD913. (10) If the 2011 Transfer Documents date back to 2011, then Wayne, an experienced businessman, never owned a 38.75% interest in the MDC Companies. He executed at least two documents in 2013 which noted his 38.75% interest in the companies, Exhibits 98 and 99. Drafts though they may be, these documents were intended to move the parties toward final versions of MDC purchase and operating agreements. (11) Wayne stated that he must have signed Exhibits 98 and 99 without reading them. Wayne also testified that he remained active in the companies after 2011 only to help Jason with practical business matters. (12) Wayne's signed Statement of Financial Affairs does not mention the transfers. Notwithstanding Wayne's purported ignorance of his own schedules, his wife Wendy prepared his schedules and the 2011 Transfer Documents. (13) Wendy drafted the 2011 Transfer Documents on her computer, which was not available for examination.

[11] Wayne's testimony on this point was not credible. The 2011 Transfer Documents do not describe any such consideration, and the parties did not produce any documents supporting the existence of the alleged $5,800 debt. These two factors, in light of the Court's assessment of Wayne's candor more generally with respect to the transfers, *see supra* note 10, negatively impact the Court's ability to rely upon Wayne's statement that he received any consideration in this so-called exchange.

8

admitted, after several evasive exchanges on the stand, that Mark spent money on behalf of the companies, seemingly hoping that the Court would believe bills had been paid without request; and eventually admitted to submitting false, sworn statements to the Court, without subsequently demonstrating any remorse in so doing.[12]

The McDonalds did appear imminently credible, however, when they represented to the Court that they never intended to transfer any Intellectual Property rights to the MDC Companies. On January 7 and 21, 2014, the United States Patent & Trademark Office issued several patents related to the Nexcavator (the "Patents"). *See* Ex. 63; Ex. 64 (describing the Patents as "Excavating Apparatus with Swivel Mount Employing Swivel Adapter with Gear Bearings Having Gears with Divergent Thickness" and "Excavating Apparatus Employing Swivel Adapter with Gear Bearings Having Gears with Divergent Thickness"). Jason holds these patents and refuses to assign them to the MDC Companies.

Had the McDonalds been consistently candid with the Court, the proceedings in this case likely would have been significantly curtailed.

## DISCUSSION

The legal issues which now remain concern: (1) the interests of the parties in the MDC Companies, and (2) the interests of the MDC Companies in the Intellectual Property. The Court will determine the ownership interests of the parties in light of the 2013 Offer, the Transfer Documents, and the Trustee's avoidance powers. Then, the Court will assess the claim to the Intellectual Property and evaluate whether Jason should be compelled to transfer the Patents to the MDC Companies. Finally, the Court will consider the remaining requests for relief.

A. The Ownership Interests of the Parties

---

[12] These false statements include, without limitation, the Second Affidavit of Jason W. McDonald, Ex. 126, and Wayne's September 23, 2013 schedules/Statement of Financial Affairs, Ex. 117.

1. Mark's Ownership Interests

Mark argues that in addition to his 22.5% interest in the MDC Companies, he has the right to claim an additional 10.83% ownership interest in the companies under the 2013 Offer. The Court cannot agree.

On the stand, Mark testified that he was given the option to claim this additional 10.83% interest at any time, after investing the equivalent of $225,000 into the MDC Companies. The best documentary evidence the Court has with respect to the 2013 Offer, likely prepared by attorneys at Tuggle Duggins under Mark's supervision,[13] provides otherwise. It states that the purchase price of $75,000 for the additional 10.83% would "be transferred directly at closing" to the companies, *see* Ex. 105, indicating that Mark in fact received an offer for an additional ownership interest in the companies in exchange for a lump sum payment on a date certain, rather than an additional ownership interest upon completion of a $225,000 investment in the companies. *See* Ex. 105. Mark did not address this language in his testimony before the Court, nor did he otherwise give the Court any reason to doubt the veracity of the document prepared by Tuggle Duggins.

Consequently, notwithstanding Mark's total infusion, to date, of $175,793.35 into the companies, the Court cannot determine the terms of the 2013 Offer, and, thus, whether the parties reached a clear and definite agreement. Therefore, the Court cannot enforce the 2013 Offer. *See generally Lassiter v. Bank of N.C.*, 146 N.C. App. 264, 269, 551 S.E.2d 920, 923 (2001) (explaining that the terms of a contract must be definite, such that a meeting of the minds has occurred, in order for a contract to be binding). As such, Mark's interest in the companies is limited by the 2012 Agreement to 22.5%.

---

[13] It is undisputed that Mark took the most active role in working with attorneys at Tuggle Duggins to finalize MDC business.

10

## 2. The McDonalds' Ownership Interests

A determination of Wayne and Jason's ownership interests in the companies requires a more thorough analysis. Because the Court cannot determine whether the McDonalds held equal shares in the MDC Companies upon the petition date, the Court will consider each of the ownership possibilities at that time in light of the Trustee's request to avoid and recover Wayne's transfers under 11 U.S.C. §§ 548, 549, and 550.

### a. The Transfers Occurred Post-Petition

Assuming that Wayne transferred his interests in the MDC Companies to Jason post-petition, then Jason currently holds a 77.5% interest in the companies, and the Trustee seeks to avoid the transfers under 11 U.S.C. § 549. Section 549 states that the trustee may avoid an unauthorized, post-petition transfer of property of the estate. 11 U.S.C. § 549(a). The transfers at issue were unauthorized. No "value" was given in exchange for the transfers, as that term is defined in Section 549(b). *See id.* (stating that "in an involuntary case, the trustee cannot avoid . . . transfer[s] made after the commencement of such case but before the order for relief to the extent any value . . . is given after the commencement of the case in exchange for such transfer).[14] Therefore, the trustee may avoid and recover these transfers from Jason. *See* 11 U.S.C. § 550 (stating that to the extent a transfer is avoided, the trustee may recover the property transferred from the initial transferee). Thus, assuming the transfers occurred post-petition, then Wayne and Jason each now hold a 38.75% interest in the companies.

### b. The Transfers Occurred Pre-Petition

---

[14] Satisfaction of a debt that arose before the commencement of the case is not considered "value" under this section. *See id.* Wayne testified that he received forgiveness of a pre-petition debt, or some work performed in or around 2011, for the transfers. If this is indeed true, then at best Wayne received satisfaction of a pre-petition debt from Jason for his interests in the companies.

Assuming instead that Wayne transferred his interests in the companies pre-petition, then the Trustee seeks to avoid the transfers under 11 U.S.C. § 548. Section 548 allows the trustee to avoid transfers made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted[.]" 11 U.S.C. § 548(a)(1)(A). This Court infers fraudulent intent from the presence of "badges of fraud." *Allman v. Wappler (In re Cansorb Indus. Corp.)*, No. 07–6072, 2009 WL 4062220, at *8 (Bankr. M.D.N.C. Nov. 20, 2009). These include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*Id.* (quoting *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008)). In this case, most if not all[15] of the badges of fraud are met.

With respect to the first and second badges of fraud, the Court has already noted that it is unlikely Wayne received any consideration at all in exchange for the transfers to his son. Even assuming that he did, $5,800 for a 47.5% interest in the companies would not have been adequate consideration. Mark, an educated, seasoned businessman, paid $150,000 for a 17.5% interest in the companies in 2012, when the companies were still less than a year old. In 2013, Mark received an offer from Wayne and Jason for another 10.83% interest in the companies for $75,000. All parties must have considered the value of the companies to be well in excess of $75,000 in 2013, when the transfers occurred. Thus, the first and second badges are met.

With respect to the fourth, fifth, and sixth badges of fraud, these factors also indicate that Wayne made the transfers at issue with fraudulent intent. The testimony before the Court

---

[15] It is unclear whether Wayne retained any benefit/use of his ownership interests in the companies after the transfers.

12

established that from 2011 until early 2013, Wayne began transferring properties from himself—or his companies—to his children, for no consideration. Whereas Wayne reported that as of December 31, 2011 he had $42,000,371.00 in assets (including only cash deposit accounts, notes and accounts receivables, real estate, machinery and equipment, and vehicles), Ex. 200, by May 17, 2013, he reported only $518,364.63 in real and personal property, Ex. 117. Though Wayne's liabilities decreased during this time, they did not proportionately drop. Wayne consciously and methodically removed properties with equity from his estate under the auspices of "estate planning." Thereafter, Wayne and his companies could not and did not generate enough income to service their debts. Loans matured. In January of 2012, Wayne and his companies began receiving demand letters. Suits followed, then bankruptcy. Somewhere in the midst of this prolonged series of financially devastating events, Wayne transferred his believed to be valuable interests in the MDC Companies to Jason. Thus, Wayne's financial affairs around the time of the transfers, the series of transactions which occurred around the time of the transfers, and the general chronology of events surrounding the transfers indicate that Wayne conveyed his interest in the MDC Companies with fraudulent intent, meeting the fourth, fifth, and sixth badges of fraud.

Because a consideration of the badges of fraud in this case leads inescapably to the conclusion that the transfers were made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted[,]" 11 U.S.C. § 548(a)(1)(A), the transfers may be avoided and recovered by the Trustee in the event that they occurred pre-petition, *see* 11 U.S.C. § 550. As a consequence of the Trustee's ability to avoid and recover the transfers at issue, regardless as to whether they in fact occurred pre- or post-petition, the McDonalds are each deemed to hold a 38.75% interest in the companies.

B. <u>The Ownership Interests of the MDC Companies</u>

Having determined the ownership interests of the parties in the companies, the Court must determine whether the MDC Companies possess any rights in the Intellectual Property, including, without limitation, the Patents. The Trustee and Mark argue that Jason should be compelled to execute an assignment of the Patents to the MDC Companies. The Court agrees.

As the United States Court of Appeals for the Federal Circuit has explained, a patent assignment is distinguishable from an *agreement to assign* a patent. *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1581 (Fed. Cir. 1991) (explaining that while the former vests legal title in the transferee, the latter only vests equitable rights). While a patent assignment must be in writing, 35 U.S.C. § 261, an oral agreement to assign a patent is valid, *e.g.*, *Dalzell v. Dueber Watch-Case Mfg. Co.*, 149 U.S. 315, 320 (1893) ("An oral agreement for the sale and assignment of the right to obtain a patent for an invention is not within the statute of frauds, nor within section 4898 of the Revised Statutes, requiring assignments of patents to be in writing, and may be specifically enforced in equity, upon sufficient proof thereof."); *Pressed Steel Car Co. v. Hansen*, 128 F. 444 (C.C.W.D. Pa. 1904) (same), *aff'd*, 137 F. 403, *cert. denied*, 199 U.S. 608; *Cook v. Sterling Electric Co.*, 118 F. 45 (C.C.D. Ind. 1902) (same), *aff'd*, 150 F. 766; *Searle v. Hill*, 73 Iowa 367, 35 N.W. 490, 491 (1887) ("The validity of a parol assignment of a patent, as between the parties, has frequently been determined by the courts."); 71 Am. Jur. 2d Specific Performance § 178 (2016) ("Parol executory contracts to assign patent rights may . . . be enforced in equity although the statutes of the United States provide that the assignment itself must be in writing.").

An agreement to assign a patent, whether oral or written, is the proper subject of an action for specific performance  *See United States v. Dubilier Condenser Corp.*, 289 U.S. 178,

187 (1933) ("A patent is property, and title to it can pass only by assignment. If not yet issued, an agreement to assign when issued, if valid as a contract, will be specifically enforced."), *amended* 289 U.S. 706.  Under North Carolina law, "[s]pecific performance will not be decreed unless the terms of the contract are so definite and certain that the acts to be performed can be ascertained and the court can determine whether or not the performance rendered is in accord with the contractual duty assumed."  *N.C. Med. Soc'y v. N.C. Bd. of Nursing*, 169 N.C.App. 1, 11, 610 S.E.2d 722, 727–28 (2005) (citations omitted).

The Patents in this case are registered to Jason and have not been assigned to the MDC Companies.  Though no recorded assignments exist, Jason orally agreed to assign the Intellectual Property to the MDC Companies.  This promise was reflected in the 2012 Agreement, in which the parties stipulated that Mark would receive a 17.5% ownership interest in the companies, including "related intellectual property" in exchange for a $150,000 investment.  By defining the companies to include the Intellectual Property, the parties underscored that such items would be considered Jason's capital contribution to the companies.  Because Jason has not transferred the Patents to the companies, he has breached an agreement between the parties.[16]  The Intellectual Property constitutes an asset of the MDC Companies, and Jason must assign the Patents to the MDC Companies.

    C.  <u>The Remaining Requests for Relief</u>

In light of the Court's determination that Jason must assign the Patents to the MDC

---

[16] *See Neal v. Marrone*, 239 N.C. 73, 77, 79 S.E.2d 239, 242 (1953) ("A contract not required to be in writing may be partly written and partly oral."); *see generally York v. Health Management Associates, Inc.*, No. 5:10-cv-000940RLV-DSC, 2013 WL 636914, at *4 n.4 (W.D.N.C. 2013) ("It remains true that 'though the North Carolina court often states the parol evidence rule in its traditional form as a bar to any prior or contemporaneous agreement which 'adds to, varies, or contradicts' the writing, the rule actually applied here in many cases seems to allow parol evidence which adds to the writing without contradicting it.'" (quoting John P. Dalzell, *Twenty–Five Years of Parol Evidence in North Carolina*, 33 N.C. L. Rev. 420, 428 (1955) (footnote omitted))).

Companies, Mark's remaining requests for relief become moot, with the exception of his request for fees. Due to the McDonald's lack of candor to the tribunal and their submission of false evidence to the Court, the Court will allow Mark to submit motions for costs and attorneys' fees under Rule 7054 of the Federal Rules of Bankruptcy Procedure, with relief subject to further review by the Court.

## CONCLUSION

For the above stated reasons, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

(1) Mark holds a 22.5% ownership interest in the MDC Companies;

(2) Wayne and Jason each hold a 38.75% ownership interest in the MDC Companies;

(3) the Intellectual Property constitutes an asset of the MDC Companies;

(4) Jason shall assign the Patents to the MDC Companies; and

(5) Mark may submit a motion for costs and attorneys' fees within fourteen (14) days of entry of this Order, with relief subject to further review of the Court. In the event that Mark timely submits such a motion, any responses thereto shall be filed within fourteen (14) days.

[END OF DOCUMENT]

PARTIES TO BE SERVED

**John Paul H. Cournoyer**
Northen Blue, LLP
Suite 435
1414 Raleigh Road
Chapel Hill, NC 27517

**Ellis B. Drew, III**
Leon Porter
Craige Jenkins Liipfert & Walker LLP
110 Oakwood Drive, Suite 300
Winston-Salem, NC 27103

**Peter J. Juran**
Stratford Exec. Pk.
215 Executive Pk. Blvd.
P. O. Box 25008
Winston-Salem, NC 27114-5008

**John A. Meadows**
2596-C Reynolda Rd.
Winston-Salem, NC 27106

William Miller
US Bankruptcy Administrator